### Culbertson's Estate.

*William J. Brady*, for James Culbertson, exceptant.

*Bernard J. O'Connell (Nathan Griffith* and *Frank R. Ambler* with him), contra.

THOMPSON, J., Feb. 7, 1930.—We have read carefully the 157 pages of testimony and the thirty-two pages of the opinion of the Presiding Judge (Gest), and are of the opinion that Judge Gest was correct in holding the will to be a forgery and in revoking the letters testamentary granted thereunder. We are persuaded in reaching this conclusion by a consideration of the following:

1. When Mrs. Culbertson died in August of 1917, she lived at No. 2130 Wood Street with several of her children. She had nine altogether. The house was a small one and a search was made for a will and no will could be found. About two weeks thereafter the will in question was found in a drawer in the bureau in the decedent's bedroom. This drawer was searched after her death for a will and it was not there then. At least three, and perhaps four, of the children were present when both searches were made, although James denies this in part and said there was only one search. James is the chief beneficiary. This, we think, is strongly corroborative of Augustus's story that he forged the will and gave it to James after his mother's death, and it was placed where it was subsequently found.

2. The will is alleged to have been forged in September, 1917, but dated back to 1907, this being the year after the death of decedent's husband, and the same witnesses were on both the will of the decedent and her husband. These witnesses are now dead, and their handwriting was sworn to by members of their family, but this testimony is very unsatisfactory.

3. In the will alleged to be forged, James, a boy about eleven years old in 1907, was named as executor. Augustus, the self-confessed forger, said they

did not think of this discrepancy of age at the time they made James an executor.

4. Augustus submitted at the hearing a draft which he practiced on before the final will was drawn. He said he made three copies before he finally got the will in the shape he wanted.

5. We think it unnatural for a mother of nine children to leave such a large portion of her estate to one child, and he about eleven years of age, to the exclusion of the rest, with all of whom she was on most friendly terms. The alleged forged will gives each child $250, and the rest of her estate, including four pieces of real estate, to James.

6. No one of the nine children knew of a will in the lifetime of the decedent, who was an illiterate woman and could not write, as she signed with a mark. It is incredible to our mind that an illiterate woman should make such a will and none of her children know anything about it in her lifetime. Augustus says he forged the will, and it is all in his handwriting. There is some testimony to the effect that the decedent some time before her death said she intended to make a will and was to go to see a lawyer about it, which she never did.

7. A comparison of the signatures of the witnesses on the forged will with signatures claimed to be genuine shows a marked difference.

8. Augustus, the alleged forger, says he used his father's will as a form. A comparison of the wills shows this to be true in part.

9. According to Augustus's testimony, the reason for the forging of the will was that James was going with a girl with whom he wanted to make a showing that he was a man of substance, and it was understood between James and Augustus that in a year or so James would sell the property and make an even division among all the children. Augustus says the will was not forged until after the death of his mother when no will was found. Augustus swears that he asked James to make this division about 500 times, and James kept putting him off until finally it worked on his conscience to such an extent that in December, 1928, he went to a policeman at 17th and Market Streets, they being in the teamster business and having an office near that point, to come and arrest James in the office; the policeman came and Augustus wanted James arrested. The policeman testified that he told Augustus that he could not arrest James, but that he should get a lawyer or go to a magistrate, and Augustus said, "If I assault him you are bound to arrest us both, and I will then tell the story." He then made an effort to assault James after charging him with participation in the forgery of the will, and James sat in his chair and made no response and said, "You have not heard my side of the story." A man charged with a crime he did not commit would not act in this way. Augustus then told the story to the family; one of the members went to James and he did not deny it, but said, "You have not heard my side of the story." This is not the natural conduct of a man charged with a crime.

10. The will is in the handwriting of the confessed forger. It will not do for the chief beneficiary, James, to say he knows nothing about the matter. If Augustus did not write the will, who did? The beneficiary should have some knowledge of who wrote the will, or the circumstances of its being written if it was written by the other members of his family. It is exceedingly improbable that the will was written by Augustus at the request of his mother and no one knew anything at all about it.

11. If the will alleged to be forged was written in 1907, where was it until found in 1917? The decedent was an illiterate woman. If the will was given to her in 1907, what did she do with it? It was not in the bureau drawer in

1917 when search was made to find the will, and it is not alleged that Augustus kept it since 1907 and said nothing about it to anybody.

12. The only testimony offered by the proponent was James himself, who disclaimed any knowledge about anything. We think it was incumbent upon James under the circumstances, as he says that the will is not in the handwriting of Augustus, to have offered some proof of a handwriting expert that this was the fact. There was no trouble in getting admittedly genuine writings of Augustus, as James was in business with him and the other brothers until 1918.

13. We feel convinced that Augustus's story of how he forged the will has been corroborated.

The decree of the Presiding Judge dated Nov. 14, 1929, sustaining the appeal and revoking letters testamentary is affirmed, and all exceptions filed thereto are dismissed.